## JOHN VINING *et al.* *v.* C. D. HALL *et al.*

1. PROBATE OF LOST OR DESTROYED WILL.—To admit to probate a lost or destroyed will, it must be shown that the will had an existence, was duly executed, was lost or destroyed, and its contents proven.

2. PROBATE OF LOST OR DESTROYED WILL: EVIDENCE OF CONTENTS MUST BE CLEAR, CONCLUSIVE, AND SATISFACTORY.—The law requires, where the probate of a lost or destroyed will is sought, that the whole contents should be established by the clearest, most conclusive and satisfactory proof. 9 Gill's R. 169; 1 William on Exrs. 332 333; 1 Lomax on Exrs. 113; 3 Eng. Ecc. R. 52; 8 Metcalf, 487, 490, note.

3. SAME: CASE IN JUDGMENT.—H. made his last will and testament, which was duly attested by two witnesses and destroyed, after his death, by some of his

heirs. The evidence, as to the contents of the will, was contradictory, except as to a clause revoking all former wills. Held—That the testimony as to the contents of the will being so contradictory, it could not be admitted to probate, and being attested by only two witnesses, the revoking clause effected only personal property, disposed of by former wills.

4. WILL, THOUGH PREVENTED FROM TAKING EFFECT, A REVOCATION OF FORMER WILLS.—A will, duly executed according to the statute, is a revocation of former wills, though the last will may be prevented from taking effect by some matter *dehors* the will, as the incapacity of the legatees to take, or the illegality of the bequests. *Hainton* v. *Hainton*, 30 Miss. 27.

APPEAL from Probate Court of Bolivar county. Hon. C. T. Miles, judge.

Appellees filed their petition in the Probate Court in Bolivar county for the establishment and probate of the last will and testament of John L. Harris, deceased. The petition states that John L. Harris was the brother of petitioners; that he died on the 9th day of February, 1856, and during his last illness and within a day or two before his death, that he signed and published his last will and testament. That a few days after his death his last will and testament was destroyed by Edward B. Harris, William Hawes Harris, and Benjamin D. Harris, brothers of said John L. Harris, deceased.

That the heirs of John L. Harris are the petitioners, the above named brothers, and the following named children of Vina Vining, deceased, who was a sister—to wit, Mary C. Allen, wife of Cornelius Allen, John Vining, and William Vining—all of whom are non-residents of the State of Misssissippi.

The petition prays that testimony may be taken, and the last will and testament so destroyed may be probated and declared to be the last will and testament of said John L. Harris.

A memorandum of the will is made an exhibit to the petition, and is in the following language:

" I, John L. Harris, of Snowden, in the State of Virginia, being of sound mind, and being about to depart from this present world, do make this my last will and testament, setting aside all others. I manumit and set free my faithful servant

Betsy and her seven children." Some of the names of the children are not remembered, but testator Harris said that Henry was at school in Philadelphia, to whom he bequeathed ten thousand dollars, and to the youngest child, Puss, ten thousand dollars, to Betsy, the mother, ten thousand dollars, and to each of the other five children of Betsy, seven thousand, five hundred dollars each.

He also manumitted and set free his servant Susan and her two children, and gave them five thousand dollars each.

He gave to his brother, Hawes Harris, and son Lucien, about forty or fifty thousand dollars, to be equally divided between them.

To his two sisters, Mrs. C. D. Hall and Elizabeth J. Dilliard, he gave his "Indian Point" plantation and all that was on it.

He, also, gave to his two neices, who were at school in North Carolina at his expense, seven thousand, five hundred dollars each.

His Louisiana Bank stock he gave to his brother, Dr. Harris, of New Orleans. That the proceeds from the sale of "Snowden" should go to the manumitted servants, and the sums bequeathed to them should first be paid. That James Harris, of Virginia, should carry out his will and settle the servants on farms in Ohio; for which service he bequeathed him twenty-five hundred dollars. That the balance of his property, after the foregoing sums were paid, was to be divided among his heirs.

Mrs. Moore, niece of testator, was bequeathed some property—what amount is not recollected.

This memorandum was furnished by Thomas Kenney, who wrote and witnessed the will.

After due and legal notice by publication to the parties interested, some of whom appeared, the following issues in the cause were ordered by the court to be made up:

1. Did John L. Harris, in his lifetime, make his last will and testament? 2. When and where was the same executed? 3. What were the contents of said will? 4. Did the same revoke all other wills made by said deceased? 5. Was the same destroyed?

The issues thus made up, were presented to a jury, who returned a verdict in favor of petitioners (appellees). An appeal was taken to the High Court of Errors and Appeals, the cause reversed on the ground, that the term at which it was tried was not a term of the Probate Court of Bolivar county, authorized by law; the legislature having, a very short time before the term at which the cause was tried, changed the time of holding the court, and the fact of the change was not known at the time of the trial.

By agreement of counsel a jury was waived, and this cause submitted to the probate judge for decision. On this trial, all the testimony was in writing, and in substance as follows:

Rice C. Ballard testified—That he knew John L. Harris intimately; had known him for twenty-five years. That he saw him last on his (witness') plantation in Madison Parish, Louisiana, about the 4th of February, 1856. Being called to New Orleans by important business, and having no apprehension that the then illness of Harris would terminate fatally, left him.

About the 2d of February, Harris had his will written by Mr. Kenney, as he, Harris, informed me the morning after it was written. Witness read the will to Harris, who stated that it was his will, and desired me to sign my name to it with those of the other witnesses, Thos. Kenney and G. O. Wilson. Not being able to procure pen and ink in the room, witness told Harris he would take the will to his office and sign it. Believing there was no danger of Harris' death, witness did not sign the will at all, and am confident Harris died under the impression that it was witnessed.

The contents of the will were as follows: It commenced by bequeathing to Dr. Harris all his Louisiana stock. It proceeded: "I have loaned to my brother, William Hawes Harris, about $50,000, one-half of which I give to his son, Lucien Harris, the balance to my brother, William Hawes Harris." My recollection is he gave to his two sisters, not naming them, his "Indian Point" plantation and all thereon, but about this witness may be mistaken. He then bequeathed to his two nieces at school in Salem, North Carolina, not calling them by

name, seven thousand five hundred dollars each. Witness thinks the will then mentioned a Mrs. Moore, but does not remember what was the bequest to her. The will then directed that certain slaves, then in Virginia, should be sent to Ohio and there manumitted. Witness recollects distinctly, that among said slaves was a woman named Betsey and her seven children. The names of two of the children were Henry and Puss, and to them, together with their mother, Betsey, he bequeathed seven thousand five hundred dollars each, and to the other five children, five thousand dollars each. The above-named amounts may not be exactly correct.

The will also directed the emancipation of Susan and her two children, who were also in Virginia, and to each was bequeathed the sum of five thousand dollars. To James Harris, twenty-five hundred dollars, as compensation for his trouble in settling said slaves in Ohio. James Harris was appointed executor.

At the time witness read the will, he asked Thomas Kenney to take a memorandum or statement of it, which he did. Knew none of deceased's relations, except Wm. Hawes Harris; did not know that he had sisters until he read the will.

James O. Wilson testified—Knew John L. Harris; saw him in his last illness on the plantation of R. C. Ballard. Present, Dr. Hubbard, of Vicksburg, and Col. A. M. Young. He died on the 9th February, 1856. About the 2d of February, 1856, he made a will. It was written by Thomas Kenney, and witnessed by said Kenney and myself. The substance of the will is as follows:

It commenced with legacies to the servants. The women, Betsey and her children, were provided for in sums varying from one to five thousand dollars; particulars not recollected. He made provision for two women and their children. The servants thus provided for to be made free and removed to Ohio, and a person of his own name, James Harris, was appointed executor, and was given twenty-five hundred dollars. After the servants were provided for, his two sisters were mentioned by name, Mrs. Charlotte Hall and Mrs. Elizabeth Dilliard, and gave them a plantation and all that was on it, negroes

and all, to be equally divided between the sisters; the name of the plantation witness could not recollect. He then gave his brother, Wm. Hawes Harris, one half of the debt of forty or fifty thousand dollars, which he owed to him, and the other half to his son Luse or Lucien. To Dr. Harris, of New Orleans, his Louisiana Bank stock. The residue of his property to be divided equally among his heirs. There was a legacy of seven thousand five hundred dollars each to some girls. This is all that witness recollects being in the will, unless it was something to Ben Harris, of which he has not a distinct recollection.

Witness received the papers and valuables of John L. Harris, deceased, from Col. A. M. Young; gave his receipt for them, and kept them in the safe under lock and key. On the 14th of February, 1856, Dr. Edward Harris and William Hawes Harris came to Col. Ballard's place in Louisiana, and witness delivered them all the papers and valuables of John L. Harris, deceased, and took their receipt therefor. They opened the bundle of papers in presence of witness, and, when they found the will, one of them read it aloud. Dr. Harris said "that it was no will at all; that he had a will that was all right." Dr. H. wanted the will; tried to get it out of Harris' possession, who would not give it up; said "it was a will, should be a will; he had it, and defied the world to get it from him." The brothers went off together, and seemed much excited.

Witness did not recollect whether Mrs. Moore's name was mentioned in the will, nor the legacy to Ben Harris, nor what disposition was made of the residence in Virginia.

Dr. Horace H. Hubbard testified—Was called to see John L. Harris, about 9th February, 1856. After his death saw a will signed by said Harris, and witnessed by Thomas Kenney and James O. Wilson. Wilson said it was Harris' will. Read the will once, and my recollection of its contents is as follows: "Certain bequeathments to servants and directions for their emancipation were provided in said will. To Mr. Hawes Harris was willed a debt, due John L. Harris from the said Hawes, and out of the amount, Lucien, the son of Hawes Harris, was to receive the sum of twenty or twenty-five thou-

sand dollars. To Mrs. Moore, of Huntsville, Alabama, was bequeathed the Indian Point plantation and all thereon; and to two other ladies, each about the sum of twenty or twenty-five thousand dollars. To Dr. Harris, of New Orleans, certain bank stocks; do not remember whether all or part in New Orleans. A Mr. Harris, of Virginia, was appointed executor.

Col. Alfred Young, testified that he saw the will of John L. Harris, deceased; gave it to James O. Wilson, after the death of Harris, for safe keeping. The will contained the following provisions: The bank stock in Louisiana was given to Dr. Edward Harris of New Orleans; a legacy of about fifty thousand dollars to William Hawes Harris, which amount he owed John L. Harris; half of the amount to the youngest son of William Hawes Harris. The Indian Point plantation and all thereon was given to a Mrs. Moore, of Huntsville, Alabama. There were other legacies to others; names and amount not recollected. To his family servants legacies as follows: to Betsey, not less than five, nor more than ten thousand dollars; to Henry, the sum of ten thousand dollars; and to two or more children of Betsey, each the sum of from twenty-five hundred to five thousand dollars. To his woman Susan, five thousand dollars; and to each of her children, from twenty-five hundred to five thousand dollars. Said slaves were to be emancipated, and to be removed to the State of Ohio, and the legacies then to be given them. James Harris, of Virginia, was named as executor, and was to receive twenty-five hundred dollars for his services. That his "Snowden" property in Virginia was to be sold, and the legacies to the servants and all expenses to be paid out of the proceeds of sale. The balance of his property to be sold and divided amongst his heirs.

Thomas Kenney testified that he wrote the will of John L. Harris, about the 2d of February, 1856; saw Harris sign it, and, at his request, he and Wilson attested it. Witness made a memorandum of the will, the morning after it was written, in his field-book, which he had used in surveying and engineering. A copy of said memorandum is as follows:

"I, John L. Harris, of Snowden, in the State of Virginia,

being, as I suppose, about to depart this life, make this my last will and testament, revoking all others." Then he manumitted and set free his servant Betsey and her seven children, and to Henry (now in Philadelphia), he bequeathed ten thousand dollars; to Pussy, ten thousand dollars; to Betsey, mother, ten thousand dollars; remaining five children, seven thousand five hundred dollars each. To Hawes Harris about forty or fifty thousand dollars of a debt; twenty-five thousand dollars out of it to his son Lucien. To Mrs. Moore, niece, the Indian Point plantation, and all on it. To Mrs. Dilliard and Mrs. Hall, sisters to John L. Harris, fifty thousand dollars each. Two nieces at school in Salem, North Carolina, seven thousand five hundred dollars each. Manumitted and set free Susan and her two children, to be paid five thousand dollars each. Willed the Louisiana bank stock to Dr. Edward Harris, of New Orleans. Requested James Harris, of Virginia, to carry out his will, and gave him twenty-five hundred dollars for his expenses. Witness recollects that in bequeathing the Louisiana bank stock to Dr. Harris, he willed that the fifty thousand dollars to his sisters should be paid out of that fund; also, that his executor was to remove his emancipated slaves to Ohio, and purchase farms for them in that State.

Shortly after the death of Harris I met a Mr. Dilliard, who recapitulated to me what Ballard and Wilson said were the contents of the will. I supposed they were correct, and made out for Mr. Dilliard a statement of the will accordingly, which I found afterwards, by referring to my field-book, was incorrect. Witness is now satisfied that the memorandum in his field-book, and which is copied above, contains the substance of the will.

Witness further recollects, that the Snowden place in Virginia was to be sold, the legacies left the servants first to be paid, and the remainder of the estate to be divided amongst the heirs.

The statement referred to, as being given to Dilliard, is made an exhibit to the petition and embodied in this abstract of the testimony.

Upon the evidence submitted the court decreed, " That John L. Harris did, on the 1st day of February, 1856, make and pub-

lish his last will and testament, revoking all others by him previously made ; that said last will and testament was to this effect and substance : That he, John L. Harris, of Snowden, Virginia, being about to depart this life, did thereby make his last will and testament, revoking all others ; that he manumitted and set free his servant Betsey and her seven children, in the State of Virginia, and to Henry, one of said children, he bequeathed the sum of ten thousand dollars ; to Pussy, another of said children, ten thousand dollars ; to Betsey, the mother, ten thousand dollars, and to the remaining five children, seven thousand five hundred dollars each ; to Hawes Harris, his brother, he bequeathed the sum of forty or fifty thousand dollars, in a debt due him by the said Hawes Harris, twenty-five thousand dollars of the same to be paid by the said Hawes to his son, Lucien ; to Mrs. Moore, his niece, he bequeathed his Indian Point plantation, with all upon it ; to his two sisters, Mrs. Hall and Dilliard, he bequeathed the sum of twenty-five thousand dollars each, to be paid out of his Louisiana Bank stock ; to his two nieces, daughters of Mrs. Dilliard, and then at school at Salem, North Carolina, the sum of seven thousand five hundred dollars each ; to Dr. Edward Harris, of New Orleans, his Louisiana Bank stock, after the payment of the sums of twenty-five thousand dollars to each of his sisters. He also manumitted Susan and her two children, and bequeathed them five thousand dollars each.   He directed his Snowden place, in Virginia, to be sold, and first, the legacies to his servants to be paid out of the proceeds, and the remainder of his property to be divided among his heirs.   That James Harris should act as his executor, and receive twenty-five hundred dollars for his services.   That the manumitted slaves should be carried to Ohio, and farms purchased for them in that State."

That said will, as far as the personal estate and choses in action, of whatever kind, of the said John L. Harris, be probated and admitted to record as the last will and testament of John L. Harris.

From this decree an appeal was taken to the High Court of Errors and Appeals.   There the following errors were assigned :

1. The Probate Court erred in admitting in evidence the

deposition of Rice Ballard—the deposition of said Ballard having been previously duly taken, and already read by appellees—and without leave of the Court or due notice.

2. The final decree of the Probate Court rendered at April Term, 1860, is not justified by, and is contrary to, the proof in the cause.

3. Said decree finds as the contents of said, bequests and provisions different from, and repugnant to the copy presented with the petition, and of which, only, probate was sought by said petition.

4. Said decree sustains and upholds illegal bequests, emancipating and making provision for slaves as part of the will.

5. Said decree should have been for defendants on the proof, and the petition dismissed.

6. Said decree was rendered when some of the parties defendant were not duly brought into court, nor had appeared, etc.

7. As to some of the defendants there was no answer, nor *pro confesso*, and the hearing was therefore premature.

The cause was submitted at the October Term, 1861, and the first and last assignment of errors sustained. A petition for a reärgument filed, and granted.

*George L. Potter*, for appellants.

On inspection of all the evidence, it will be seen that the witnesses disagree as to the contents of the will. There exist such contradictions among them, that it seems impossible to say that any of them give a correct statement of the substance of the instrument.

The rule in relation to the extent of the proof necessary to establish a lost contract, has been thus declared: "The substance of the contract must be proved satisfactorily." *Tayloe* v. *Riggs*, 1 Pet. 600.

The proof "ought to leave no reasonable doubt as to the substantial parts of the contract." *Renner* v. *B'k Columbia*, 9 Whea. 581.

In the case of a lost will, the rule of proof is thus stated: "If the will is lost, two witnesses, superior to all exception, who

read the will, prove its existence after the testator's death, *remember its contents* and depose to its tenor, are sufficient to establish it." Toller Exrs. 71. By this rule, there are to be two witnesses who agree, who remember and prove *the whole will*—not a part only. This requirement of two witnesses arises under a rule of the ecclesiastical courts and if it may be disregarded, the rule requiring full proof of contents still prevails. The proof as to *the entire contents* should be conclusive and satisfactory; and the authorities on this question all hold this doctrine. The contents must "be established by the clearest and most conclusive and satisfactory proof." *Rhodes* v. *Vinson*, 9 Gill, 170, 171. "The contents of the will cannot be proved unless by the clearest and most stringent evidence." "To authorize the probate of a lost will by parol proof of its contents, depending on the recollection of witnesses, the evidence must be strong, *positive, and free from all doubt.* Courts are bound to consider such evidence with great caution, and they cannot act on probabilities." 8 Met. 487-90. In *Durfee* v. *Durfee,* probate of a copy of a lost will was rejected because the witness "could not swear *positively* that *every provision* of the original was contained in the copy." 8 Met. 490, note; 1 Lom. Exrs. 232 (112, 113). It is manifest that the uncertain testimony of Kenney, whose evidence was followed by the court, does not come up to the requirements of the rule; and, moreover, the other proofs, in important particulars, are against it.

We have collated the evidence of the several witnesses, as to the contents of the will, and present it in an abstract filed herewith. This brings together the statement of each witness, as to each provision of the will, so that they may be contrasted at a glance, and we refer the court to that abstract to show the differences and contradictions among the witnesses, instead of setting them forth, at length, here. It will there be seen, that Kenney is contradicted in important particulars, and unsustained in other essential matters, on which *he has contradicted himself.* We note, however, some particulars:

In the amount of the bequests to emancipated slaves, he exceeds the other witnesses in the sum of $27,500, and over.

There is also a discrepancy as to the number of slaves to whom bequests were made. So, as to the bequests of "stock"—one says, "all his Louisiana stock;" another, "certain *bank* stocks, all or part in New Orleans;" another, "his bank stock in Louisiana." Kenney says, "all his Louisiana *Bank* stock." In his "field-book" memorandum, he says "*Louisiana stocks.*" So, as to the "Indian Point" property—two say he gave it to his two sisters—others say to a niece. So, as to the $50,000 cash to Mrs. Hall and Mrs. Dilliard—Kenney alone says the legacy was to be deducted out of the "stock" given as above; and no other witness *names* them as persons to whom a cash legacy was given. So, as to the residue of the estate, one says it was given *in kind* to *the heirs;* another that it was so given to the *other* heirs; another that it was to be sold, and the proceeds divided among the *heirs.* So, as to "Snowden"—three witnesses omit it altogether; Kenney says it was to be sold, and the legacies to the slaves paid out of the proceeds. In his statement given to Dilliard, and made an exhibit to the petition, as a copy of the will, he says the will provided "that the proceeds of the sale of Snowden *should go to the manumitted servants.*" This would give them all the proceeds of that sale, *in addition* to their other legacies. Young says that out of the proceeds of this sale, the legacies to servants, and "all expenses" were to be paid. In his "field-book" memorandum of the will, Kenney says nothing of Snowden, nor of the fund from which the legacies to the sisters or the servants were to be paid. The evidence of Kenney cannot, therefore, support the decree as to the contents of the will. What, then, is to be done? The authorities above cited show that, in such a case, at least the *whole substance* of the will must be proved, and there is plain good sense in the rule. You cannot take a part of the contents and say you will establish *part* of the will, when it is confessed that there were other material provisions which cannot be ascertained. The *whole* document, and only the whole, is the will of the testator, and it is absurd to take an isolated part, and establish it as the will; for the chances are that he would have preferred to die intestate rather than make that

fragment his whole will. What would be said of a court which should attempt to enforce a complicated lost contract, upon proof of only a single clause of it—to enforce that isolated clause as the contract, or give effect to it under any pretence? It is true, the courts do, in some cases, sustain only *parts* of the paper propounded; as where a particular clause was inserted by fraud, or when the testator was incompetent; but this is confessedly on the ground that such clause was never, in fact, a part of the will. 1 Lomax Exrs. 244 (122).

So, as matters of construction, illegal clauses are rejected as no part of the legal will, but the courts uphold the residue in such cases, upon the supposition that the testator had in view the possibility of such a result, and that he intended the other clauses to stand, in any event. These cases and the reasons for them are wholly different from the present.

The cases upon incomplete testamentary papers are more nearly like the present, and the rule in such cases is thus stated: "If, in its actual state (part of a lost will), the paper contains only a *partial disclosure* of the testamentary scheme of the deceased, it necessarily fails of effect." 1 Lomax Exrs. 43.

In a case where a memorandum had been made in order to have drawn a will of lands and personalty, and the memorandum was offered for probate as a will of personalty, it was rejected upon the ground "that the paper comprehended the disposition of lands, and that they and the personalty throughout were so blended and linked together, that they could not be torn apart, without the grossest violation of the testator's intentions." 1 Lomax Exrs. 44.

This reason is conclusive against the attempt to set up part only of a lost will. You cannot say the testator would have made any part of the will, except as *a part of the whole;* and the presumption is conclusive that he made a particular bequest to one, only because he had made other bequests to others; that the bequests are mutually dependant, and neither would have been made without the others; and therefore to admit a *part* only of a will to be sustained, under such circumstances, is to

do violence to the intent of the testator, or rather to make a will for him.

Again, you cannot cull out portions from the evidence of different witnesses, and give them effect as the *will*, for that would be to make a will for the testator by patch-work and guessing; and, besides, the court in such a case "cannot act on probabilities." 8 Met. 489, 490.

. We have said the decree follows the deposition of Kenney; but it contains, as *parts of the will*, a few interpolations; which no witness, unless it be Ballard in his *second* deposition, pretends to say were *in the will*. Thus, it speaks of the manumitted slaves as being *in Virginia;* and the manifest intent was to preclude any suggestion, that, under our laws, the acts of emancipation and the dependent bequests were void. It is a quiet attempt to settle a point not submitted in the issues to be tried. So, as to the legacies to *nieces*, the decree makes the will to describe them as the daughters of Mrs. Dilliard, when there was no such proof. It also describes them as at school "*at Salem*," in North Carolina, but this is only found in the second deposition of Ballard. In his first deposition Ballard says that this was "*either* stated in the will, *or* he (testator), in the course of conversation afterward, told me so." Unless these *descriptive* words were in the will, they should be rejected. It seems clear the two nieces were at school in North Carolina; but it was wrong to add words not in the will, in order to give the legacies to daughters of Mrs. Dilliard. It may be, there were other nieces at school in North Carolina, and who were the persons intended. In this, also, the decree is wrong.

Again, the will as found by the decree is very different from the paper annexed to the petition, and propounded for probate. The petition says: "A *copy of said will* is filed herewith and made a part hereof, as Exhibit *A*." That exhibit is a copy of the will sought to be probated, and it would seem that on such a petition, a decree could not be made for probate of another or different will.

Again, the petition is filed against the heirs of Harris, and

publication was made against them; but some of them neither answered, nor was the petition taken for confessed. This seems an error, and should be corrected.

Again, we note the point and raise the objection that the decree allows probate of those clauses providing for the emancipation of slaves, and for bequests to them. This court has held that probate should be granted of the whole will in such cases, leaving the proper tribunals to pass upon the validity of the bequests. But the courts of Virginia seem to hold that "the effect of the will, to the extent that probate is granted, cannot be controlled or questioned in a collateral way, or in any other court." 1 Lomax Exrs. 344, section 6.

Courts of equity have assumed an authority so to construe clauses as to render them ineffectual. Ib. 346, 347.

But a question may arise whether such a practice is proper, under our system. The probate court seems to be the proper tribunal to decide what is the legal will of any person; and it seems manifest that an illegal clause, being a nullity, is no part of the will; and the executor should not be authorized to carry such clause into effect. The grant of letters seems not only to authorize but to require the executor to execute the will *as probated;* and it would seem strange that after paying a bequest under an illegal clause, thus sanctioned by the decree of probate, he should be held to refund the amount thus administered according to the tenor of the probated will. But such a result must follow, if this probate is proper. Suppose the executor in this case removes the slaves to Ohio and pays them their legacies, according to the will as probated; has he violated his duty, or complied with his oath to execute the probated will?

The rule in England seems to have been adopted because of the peculiar character of the courts in which probate was had. The ecclesiastical courts merely ascertained and declared the testamentary character of writings, and left the exposition of them to other courts (see 1 Jarm. Wills, 22, 23); but our probate courts have much greater power; and a different rule applies.

We suggest these matters, in order that they may have consideration, and the parties not be precluded from a proper

objection, if it should be found that a different practice ought to prevail here.

Another question arises : All the witnesses who speak to the point agree that the will revoked all former wills. In view of the fact, what is to be the result, if, from defect of proof, the bequests of this will cannot be established? We say that the will should be set up *as an act of revocation only*. The clear intent to revoke former wills is ascertained, and should be made effectual. In *Harwood* v. *Goodright*, Cowper, 90, 93, the jury found a special verdict (pages 87, 88), stating that there was a subsequent will, "different" from a former will, but "in what particulars is unknown." The question was, whether the finding should be held a revocation of the former will. Lord Mansfield said (pages 90, 91) : "It is not found that this will was revoked. But the jury find that the testator made a second will. It is stated that the disposition made by this second will is inconsistent with the devises contained in the former. No." "The jury have not found any revocation of the former will; nor is there any in point of law; for the mere circumstance of making another will (which might not affect the first) is not virtually a revocation of a will of land " (page 93). It is plain from the whole case, that if, as here, there had been proof of a revoking clause, without any further proof of contents, the former will would have been held to be revoked; and such a paper is manifestly proper for probate—probate should therefore be allowed of this revoking clause, though no other part be established. The proof shows an intent to revoke all former wills, and a formal act of revocation done. It is thus ascertained that this lost will did revoke all former wills—the intent of testator changed, and he manifested it in due form; and this fact must be regarded, though no other part of the lost will can now be satisfactorily proved.

Lastly, as to the exceptions to Ballard's second deposition. This second deposition was taken without leave of the court, and without notice. The settled rule is that a deposition, duly taken, cannot be *re-taken* without leave of the court. The first deposition here was duly taken, on due notice to Moore

and wife, who having had opportunity to examine the witness, show no excuse for not doing so, and ask to reëxamine him. As to want of notice, the proofs show that appellants had an attorney in this State, and, therefore, appellees cannot rely on Rev. Code, page 514, section 213. The fact that this was unknown to appellees is immaterial, as the statute makes no such exception.

The act requiring objections to depositions to be filed (Code, page 215, section 221), does not apply to probate courts. Laws regulating practice in each court are only applicable to that court, unless there is an express extension. When, therefore, it is intended a law shall apply to all courts, the legislature have expressly declared to that effect. But, even under the act, objections to "competency" need not be filed, and it is clear that a question as to an *ex parte* deposition, and one re-taken without leave, is one of "competency." The evident purpose in offering the second deposition was to impair the weight of the first (from which, as may be seen on examination, it differs widely), and to establish by the second, facts not stated in the first. Such a course is intolerable without special leave of the court.

*Wm. Yerger*, for appellees.

The questions in this case are almost entirely questions of fact. John L. Harris died in Louisiana, where he was sojourning temporarily, and made his last will and testament shortly before his death. This will was destroyed by one of his heirs-at-law, and some of the devisees under it sought to establish it on proof of its destruction and its contents, and the proof being fully satisfactory it was established as proven. The appellants not satisfied with the decision, bring the case to this court. We represent Moore and wife, two of the appellees.

The death of Harris, the execution and destruction of the will, are all admitted by opposing counsel. The contents of the will are fully proved, and the facts as we can *claim* warrant the decree.

The rule has been long established, that if a will be duly

executed and not revoked, is lost, or destroyed, or mislaid, either in the lifetime of the testator without his knowledge, or after his death, it may be admitted to probate upon satisfactory proof being given of its having been so lost, or destroyed, or mislaid, and, also, of its contents. 1 Phillimore R. 149; 3 Missouri, 507; 2 Const. Ct. R. 334; 4 Cowen, 483; 8 Humphrey, 390; 1 Addams, 74.

This proposition is admitted by opposing counsel, but they say the evidence must be most clear and satisfactory of the whole contents of the will so lost or destroyed, or it cannot be admitted to probate.

In regard to the evidence necessary to establish the contents, we presume that it should be of that kind necessary to establish the contents of any other lost document, to wit, sufficient to satisfy the mind—not upon mere vague presumption, but by proof of facts calculated to produce conviction in the mind of a reasonable man. In the present case no doubt can exist, as we conceive, in relation to the contents of the will. It satisfied a jury who tried this case in the first instance, but whose verdict had to be set aside, being rendered at a time when the legislature had changed the term of the court, but which fact was unknown to the probate judge. It also satisfied the probate judge, and can leave no doubt on the mind of any one.

It is said the whole contents of the will must be proved or it cannot be admitted to probate, and counsel cite to this proposition, 8 Metcalf, 487. That case does not establish any such general proposition, but only declares, in relation to the *particular* will before the court, "that it could not be admitted to probate on proof of part of its contents." The court says—"As to some parts of this will, the witness who testifies to its alleged contents will not swear positively, and this we consider an insuperable objection to the probate of the whole will. *It is not such a will as may be proved in part and disproved in part.*" Thus showing that the court understood that there were such wills. I take this to be the rule of law on this subject. If a will contain several distinct and independent bequests to different parties, and is lost, proof of either independent bequest may

be made, and as to it the will established, without proof of all. But if the will undertakes to make an entire distinction of the estate, and the bequests are connected together, and not distinct and independent, but each dependent on the other, then the whole must be proved, because otherwise the will or intentions of the testator cannot be known, and this is the purport of the decision in 8 Metcalf.

In *Steele* v. *Price*, 5 B. Monroe, 58, that where a will is proved to be duly published, and is lost or destroyed, and only part of its contents is proved, it may be established as far as proved, and this is the rule of common-sense, if the will contains distinct, independent and unconnected bequests. Suppose one clause in a will should, by accident, be defaced and obliterated so that it could not be read, would the whole will, containing other independent bequests, fail in consequence of this accident? No one will so contend. Yet it would be as reasonable so to hold as to declare that, in case of a lost will, a bequest to A, fully made out by proof, should not be upheld, because the witnesses could not remember the nature of a bequest to B, also contained in the will. Every analogy of the law is against the proposition contended for by counsel. .

If one devise in a will is void, because illegal, it does not destroy the whole will, but only such parts as depend on or are connected with the illegal devise. So, also, in the case of acts of the legislature, one clause or section may be void because unconstitutional, but the remainder of the law, if not connected with or dependent on the unconstitutional clause, will be enforced. But an elaboration of the proposition seems entirely useless.

We think we may safely lay down this to be the rule of law. If a will, duly executed and not revoked, be lost or destroyed, it may be admitted to probate on satisfactory proof of its contents—that is, on proof sufficient to produce reasonable certainty in the mind of a reasonable man—and that if the will contain several independent, distinct, and unconnected bequests to different parties, it will be admitted to probate as to such bequests as are satisfactorily proven and established, although there may be

other independent bequests which, from want of memory or other cause, cannot be proven.

HARRIS, J., delivered the opinion of the Court :

The defendants in error, Charlotte D. Hall and Elizabeth Dilliard, filed their petition in the Probate Court of Bolivar county, praying the establishment and probate of the will of John L. Harris, deceased, which they allege was destroyed by some of the appellants and heirs-at-law of the said Harris, to the prejudice of the petitioners, who were legatees under the will. The cause was heard in the Probate Court, and a decree rendered establishing the will as a bequest of personal estate, and admitting the same to probate as such.

From this decree an appeal was prayed, and the cause brought to this court by the appellants for revision. At the October Term, 1861, of this Court, the cause was submitted on brief of counsel, and the decree in the court below reversed on the first and last grounds of error assigned.

First, because the Probate Court erred in admitting the deposition of Rice Ballard, taken a second time, without leave of the court, to be read in evidence, after the reading in evidence of his first deposition by the appellees ; and second, because, as to some of the defendants below, there was no answer, or *pro confesso*. An application for a reärgument was filed and allowed, and the cause is now again submitted for our consideration with the request of counsel on both sides at the bar that the court should consider the cause on its merits.

Waiving, therefore, the points discussed and decided on the first argument of the cause, we have carefully examined this record in reference to the propriety of the decree in the court below, establishing the will and admitting it to probate on the evidence before us in the bill of exceptions agreed on in the court below by the counsel of the respective parties.

It is assigned for error in the second and fifth causes, that this decree is not justified by, and is contrary to, the proof, and that it should have been for the defendants below, and the petition dismissed.

The rules of law governing the establishment and probate of wills, which have been lost or destroyed, have regard, first, to the proof of their existence and proper execution; second, to the evidence of their loss or destruction; and third, to the proof of their contents.

It seems to be beyond dispute, in the case before us, that the decedent made a will, duly executed, to pass his personal estate, and that the will was destroyed by some of the parties to this litigation. It is only needful, therefore, to examine what are the rules governing the proof of its contents, in reference to the facts in this case.

It is well settled that when the contents of a will, improperly destroyed, are satisfactorily proved by witnesses, they will be established as the will; but the policy of the law requires such contents to be established by the clearest, most conclusive, and satisfactory proof. Such is the language of the court in *Rhodes et al.* v. *Vinson et al.*, 9 Gill's R., page 169; and to the same purport see 1 Williams on Exrs., page 332, 333 and notes; 1 Lomax on Exrs., page 113; 3d Eng. Ecc. R., page 52; *Huble* v. *Clark*, 8 Metcalf's R., page 487; *Davis* v. *Sigourney*, and *Durfree* v. *Durfree*, page 490, note. In the case of *Davis* v. *Sigourney*, cited above, the court says: "Although an unrevoked will, which is lost or destroyed, may be admitted to probate, upon parol proof of its contents; but it will not be so admitted, unless the evidence of its *whole* contents is most clear and satisfactory."

And in the case of *Rhodes et al.* v. *Vinson et al.*, it is said that the authorities all hold the doctrine on this question that the proof of the entire contents should be conclusive and satisfactory.

We are then to inquire whether the contents of the paper which was destroyed are satisfactorily proved. On this point we think the testimony in this record, instead of being clear, conclusive, and satisfactory, is most contradictory, inconclusive, and unsatisfactory. The whole case was submitted in the court below, as it is here, upon written testimony, the depositions of witnesses, all of equal credit, and all intending to speak the truth, so far as it is possible for us to know. How testimony so contradictory in the most material matters can be reconciled, so as to

be regarded here as clear, conclusive, or satisfactory, we are wholly unable to discover.

To illustrate, we will refer to an abstract of the evidence in some particulars. In regard to the manumission of the slave Betsy and her children, and the legacies bequeathed to them, witness Kenney, in stating his recollection of the contents of the will, says—The testator manumitted Betsy and her seven children, and gave her $10,000; to Henry, $10,000; to Pussy, $10,000; and to the other five children, $7,500 each.

. Ballard, in his first deposition, says,—The testator gave to Betsey, $10,000; to her son at school in Philadelphia, $10,000; to a girl-child of Betsey, $7,500; to another girl-child of Betsey, $7,500; to another girl-child of Betsey, $5,000.

In his second deposition, this same witness, Ballard, says,— Testator gave to Betsey and two of the children, Henry and Puss, $7,500 each; and to five others, $5,000 each.

Young says,—Testator gave to Betsey not more than $10,000, nor less than $5,000; to Henry, $10,000; and to one or two more children of said woman, Betsey, each the sum of from $2,500 to $5,000.

Wilson says,—The woman Betsey and several of her children were provided for in sums varying from $1,000 to $5,000.

From this testimony we think it would be difficult to decide what were the specific dispositions of testator's will in relation to Betsey and her children, or even how many of her children were provided for. The proof on this subject is certainly not clear, conclusive, and satisfactory.

Again, as to the disposition of certain bank or other "stock" or "stocks," in Louisiana.

Witness Kenney says,—The will gave to Dr. Harris "*the Louisiana Bank stock.*" In his deposition, as well as by other testimony, it appears that this witness drafted the will, the contents of which he is introduced to prove. It further appears from his deposition, that, on the next morning after the execution of the will, he took a memorandum thereof in his field-book, he being a surveyor or engineer, from which he says he copies the "foregoing items of the will." But when the field-

book is examined, as it appears in this record, it is there said, "Louisiana stock to Dr. Harris of New Orleans— brother."

Witness Ballard (in his first deposition) says—Testator gave to his brother, Dr. Harris," *all his Louisiana* STOCKS." Witness is confident the will said *Louisiana* STOCKS, not "*Bank stocks.*" . In his second deposition, this same witness says of this will— *I think* it commenced by bequeathing to Dr. Harris "*all of his Louisiana stock.*"

Young says—The bequest was of "Bank stocks in Louisiana." Wilson says—It was "his Louisiana Bank stock."

Hubbard says—"Certain Bank stocks;" don't recollect whether all or a part in New Orleans.

From this record we cannot say whether the testator intended to dispose of his "Louisiana Bank stock" or his "Louisiana stock" or "stocks," or even what stock he owned in Louisiana.

Again, in relation to his "Indian Point plantation and all upon it"—

Witness Kenney says—"To Mrs. Moore (niece), the Indian Point plantation and all upon it." "To Mrs. Dilliard and Mrs. Hall, fifty thousand dollars equally (sisters)." "Recollects that in bequeathing the Louisiana Bank stock to Doctor Harris he willed that the $50,000 to be paid to his two sisters, should be paid out of that fund."

In his statement of the contents of this will furnished to Dilliard as a memorandum of what he would prove, this same witness says—"Mr. Harris bequeathed to his two sisters, Mrs. C. D. Ha.. and Mrs. Elizabeth Dilliard, his Indian Point planta- tion, with all that was on it."

In his field-book memorandum, nothing is said of the pay- ment of the $50,000 legacy out of the stocks.

Witness Ballard, in his first deposition, says—"The will then gave to his two sisters his Indian Point plantation and all thereon to be shared equally between them."

But in his second deposition, after making the same state- ment, he adds—"*But about this I may be mistaken.*" He next mentions the bequest to two nieces, and then says—"I think he

then named a Mrs. Moore, but do not remember what was the bequest to her."

Witness Young says—" The next legacy that I recollect particularly about, was that he gave his Indian Point plantation, in the State of Mississippi, and all on it, to a Mrs. Moore, his niece, of Huntsville, Alabama;" and adds, " There were other legacies left to others, the names of whom and the amounts I do not recollect."

Witness Hubbard says—" Also Mrs. Moore of Huntsville, Alabama, was bequeathed the Indian Point plantation and all thereon, and to two other ladies each about the sum of $20,000 or $25,000."

Witness Wilson says—" After the servants were provided for, he mentioned his two sisters by name, Mrs. Charlotte Hall and Mrs. Elizabeth Dilliard, and gave them a plantation (the name of which witness cannot recollect) and all that was on it, negroes and all, to be equally divided between his sisters."

On cross-examination, he says "that he does not remember that Mrs. Moore's name was mentioned in said will or any legacy left her."

This Indian Point plantation, with the property upon it, from what appears in this record, probably constituted a large portion of the testator's estate, and yet the evidence is contradictory and wholly irreconcilable as to whether the testator gave this large property to his niece, Mrs. Moore, or to his two sisters, Mrs. Hall and Mrs. Dilliard.

It will be observed that the decree of the court below, adopted for the most part the testimony of the witness Kenney, who drew the will. It appears from this record, that his testimony consists of three versions of this will: first, the memorandum thereof in his field-book, made by him the morning after the execution of the will; second, the statement of what he would prove, furnished to Dilliard about two months thereafter; and third, his deposition taken about two years after the execution of the will. The testimony of this witness, as thus exhibited in the record, is not only uncertain and unreliable, from defect of memory, but contradictory in most material and important

Vining et al. *v.* Hall et al.

dispositions of the will it is introduced to establish. No two of the versions agree with themselves, nor is any one of them sustained by the other evidence in the cause.

Without following further the contradictions and uncertainties appearing in the evidence before us, as to what were the contents of the will sought to be established, we think it manifest that the decree founded on it cannot be upheld under the rules of law to which we have adverted, except in so far as it establishes the revoking clause, about which there is no serious conflict in the testimony before us. It is the inclination of courts everywhere in this country, to apply with the greatest strictness, to cases of wills, the rules applicable to the proof of the contents of lost instruments. As the basis of judicial action we have seen that such proof, in the case of wills, must be clear, conclusive, satisfactory.

In view of the facts of this case, we deem it unnecessary to discuss or decide the question discussed in the briefs of counsel, as to the probate of so much or such parts of a will as are satisfactorily proven, or whether the *whole* contents of the will must be established, or what are the exceptions to that rule.

The case before us only presents the question of the establishment of the revocation clause, which is clearly proven. The case of *Hainston v. Hainston*, 30 Miss., page 27, and authorities there cited, clearly settle our duty in this respect, holding that a will duly executed according to the statutes, though prevented from taking effect in consequence of some matter *dehors* the will, as the incapacity of the person to whom the disposition is made to take, is a revocation of a former will.

The will attempted to be established in this case having been attested by only two witnesses, the clause of revocation contained therein under our statute can only affect personalty, disposed of under prior wills.

Let the decree be reversed, and a decree entered here in accordance with this opinion.